TOM SHAW, INC.

v.

Robert E. DERECKTOR of Rhode Island, Inc.

Civ. A. No. 85–402.

United States District Court, D. Rhode Island.

July 9, 1986.

W. Slater Allen, Jr., Providence, R.I., for plaintiff.

Brendt W. Anderson, Roberts, Carroll, Feldstein & Tucker, Providence, R.I., for defendant.

## OPINION

FRANCIS J. BOYLE, Chief Judge.

Car Float # 12 is a barge owned by Plaintiff. It was built in 1923.[1] The barge is approximately 210 feet long and 34 feet wide, has a draft of 4 to 5 feet with 4 to 6 feet freeboard. It was built of 24 compartments each with a hatch, arranged three across and in eight rows. On March 27, 1985, the barge overturned while being towed to Point Judith, Rhode Island from Davisville, Rhode Island. It was carrying a cargo of boulders to be used in the restoration of a sea wall. The stone was in the order of 12 to 15 ton boulders. At the time that the barge tipped over, the Plaintiff was in a state of "demobilization" on its contract. There remained seven loads of stone to be delivered. The normal turnaround time was three days per load. The Plaintiff had contracted with the Army Corps of Engineers to perform the work at Point Judith.

After it overturned, the barge was towed to Galilee, Rhode Island where the Plaintiff's employees sought to right it by attaching lines to its opposite side and pulling on the lines with a tug. Temporary hatch

---

1. A car float is a large flat bottomed boat fitted with railroad tracks, for transporting trains of freight cars from one wharf to another. *Funk & Wagnalls, New Standard Dictionary of the English Language (1934).*

covers were applied. This effort was not successful. The barge was then taken to Davisville, Rhode Island and on Monday, May 20, 1985 to Defendant Derecktor's Shipyard in Middletown, Rhode Island. There it sank in another unsuccessful attempt to right it. The barge was flipped over but it sank alongside Defendant's bulkhead. In the process of flipping the barge and in an effort to minimize the effect of its sinking, Defendant's crane was damaged.

Before car float #12 was brought to the Defendant's shipyard it had been towed to the Harbor of Refuge where the first attempt to right it was made by the Plaintiff. A single steel pad eye[2] was welded to the side of the barge and a cable attached to the pad eye was carried up the side and across the upturned bottom of the barge to a tug on the side of the barge opposite the pad eye. The effort was made to pull the side of the barge to which the pad eye was attached up and over thereby righting the barge. The attempt was made after the hatches were secured with plywood covers, using sealing material around the edges and held in place with a bolt attached to a 2 by 4 across the interior part of the hatch. Some repairs were also made to the bottom of the barge to make it more watertight. Some weeks later two additional pad eyes were welded to the side of the barge equidistant from the ends of the barge and 106 feet apart. The pad eyes were described as being a little better than an inch thick, flat-stock plain hot rolled carbon steel, 8 to 10 inches long, with a hole to receive an attachment, and with a hardness of 81.3 on the Rockwell B schedule and a tensile strength of 73,400 lbs. per square inch. These pad eyes were used in the attempt to flip the barge at Defendant's yard.

After the May 20, 1985 effort to right the barge at the Derecktor Shipyard, Plaintiff's employees made an effort to keep the barge afloat, but it failed. They then left the barge, never thereafter to return. Two efforts by the Defendant's employees were subsequently made to raise the barge, one by pumping up the center line tanks, which was not successful, and the other by lifting and pumping, using a number of pumps. The first effort of Defendant to raise the barge was made in the first week of June, 1985 and Derecktor's people worked for three days. The barge had been raised by the 21st or 22nd of June and placed in a small dry dock where work was done to make it watertight. The barge was removed from the Derecktor Shipyard on August 12, 1985.

The Plaintiff corporation completed its contract with the Army Corps of Engineers on May 13, 1985. The Army Corps of Engineers cancelled its contract with Plaintiff on May 20, 1985. On October 3, 1985 Plaintiff's tug and two other barges left Rhode Island to return to Cheboygan, Michigan with heavy equipment which had been used in performing the contract. Some equipment was left behind in Rhode Island. The Plaintiff had a substantial quantity of large equipment in Rhode Island which had been acquired to perform the contract, including substantial quarry equipment and loading equipment and which under the contract could be moved to Cheboygan, Michigan at the expense of the government. The Plaintiff estimated this cost at $266,465.

The Plaintiff contended that it intended to transport the equipment on car float #12 and that it was prevented from doing so because of the failure of the Defendant to successfully right the barge in May of 1985. At the time of trial, it was the government's position that it would not make the payment to Plaintiff. Plaintiff was, however, pursuing a claim against the government for the payment in an action entitled *Tom Shaw, Inc. v. The United States of America*, #668–85c, in the United States Court of Claims. The Plaintiff completed its obligations under the con-

---

**2.** A pad eye is a fixture attached to the surface of a vessel with a hole in which a line, cable or chain may be secured. "Pad eye" is defined as "an inverted 'U' shaped fitting used to shackle gear to the deck." *Osnovitz v. United States,* 204 F.2d 654, 655 (3rd Cir.1953). The "pad eyes" involved in this action were triangular shaped with a hole to receive a fitting.

tract with the Army Corps of Engineers, using another smaller barge which it owned, and proceeded to ship some of the construction equipment to Cheboygan on that barge and another owned by the company, and towed by its tug, the Robert Charles. At the time of trial, because of delays in transit, the tug and barges had not reached Cheboygan.

Estimates of the fair market value of Car Float # 12 after it had been successfully righted varied from $10,000 maximum by Plaintiff's expert to $33,000 by two of Defendant's experts.

The Plaintiff contends that the Defendant was negligent in the manner in which it sought to right the barge, and the Defendant contends that the Plaintiff was negligent in its failure to make the barge watertight and to attach pad eyes of adequate strength. The underlying relationship between the parties is contractual. There is however no written contract. Plaintiff first contacted the Defendant employees because of information that the Defendant had a crane which was adequate to flip the barge over. The Plaintiff claims that during the effort to right the barge, the barge was damaged and that it lost the difference between the purchase price of the barge, $35,000, and the price at which it was sold, $11,000. It also claims consequential damages. Plaintiff seeks reimbursement of monies which would have been paid to it for transporting its equipment to Cheboygan, Michigan under its contract with the Army Corp. of Engineers. Defendant seeks reimbursement for damages sustained by its crane in an unsuccessful attempt to right the barge and the cost of raising, repair and dockage of the barge.

■ Addressing first the claim of the Plaintiff against the Defendant, apart from the issue of liability, in order to recover in a negligence action, it is axiomatic that Plaintiff has the burden of proving damages by a fair preponderance of the evidence. Damages must be proved. They are not to be presumed. *Blake v. Robertson*, 4 Otto 728, 94 U.S. 728, 733, 24 L.Ed. 245 (1876). The Plaintiff has completely failed to prove damages. The credible evidence is that the car float was worth as much on the market after the Defendant salvaged it as it was before the sinking; in the area of $33,000.

■ The so-called consequential damages which the Plaintiff seeks in the amount of $266,465 are wholly unsubstantiated. The Plaintiff claims that it is entitled to reimbursement for the cost of transporting its equipment from Rhode Island to Cheboygan, Michigan. The claim is that the Defendant maintained custody of the car float for 84 days and therefore Plaintiff was unable to timely move its equipment, resulting in the loss of its right to obtain its removal costs from the government.

There was no evidence that the detention of the car float was solely the responsibility of the Defendant. Indeed, the Defendant seeks payment for storage of the car float at its dock from June 28 to August 11, 1985. Except for evidence that it made one unsuccessful effort on the evening after the sinking of May 21, 1985, there is no evidence that Plaintiff made any effort to regain possession of the car float until this action was begun on June 28, 1985. Although this action initially sought a restraining order to obtain possession of the car float, it was continued to July 24, 1985 when an Order was entered by consent that Plaintiff may remove the barge upon posting bond of $50,000. The bond was not filed until August 7, 1985 and possession was taken thereafter by the Plaintiff. Thus the delay was not attributable to Defendant.

The evidence also was that the Plaintiff's contract was terminated by the Corps of Engineers on May 20, 1985, almost two months after the car float capsized and the day after the car float sank at the Defendant's breakwater. It was not needed to complete the contract. If it was needed to transport Plaintiff's heavy equipment back to Michigan, Plaintiff made no determined effort to obtain either possession or a replacement. Although the Plaintiff testified that he had been unable to obtain a replacement, the Court is satisfied that the credi-

ble evidence is that replacements were available for a car float built in 1923, yet none were hired. Further, if the Plaintiff has a claim, it is with the government and not against the Defendant. "The question is not what speculatively [Plaintiff] may have lost, but what actually he did lose." *Cincinnati Gas Co. v. Western Siemens Co.*, 152 U.S. 200, 205, 14 S.Ct. 523, 525, 38 L.Ed. 411 (1894); *see also Barber Lines A/S v. M/V Donau Maru*, 764 F.2d 50 (1st Cir.1985); *Petition of Kinsman Transit Company*, 388 F.2d 821 (2d Cir.1968).

■ Thus, assuming the Defendant was negligent, the Plaintiff has proven no damages and judgment must enter on the complaint for the Defendant.

Turning now to the Defendant's counterclaim against the Plaintiff, the Defendant seeks costs of repairs and storage, dry dock charges and reimbursement for damage to its crane. The cost of repairs to the crane is stipulated at $255,000. The cost of repairs, dry dock and dockage, is $103,923.33.

■ The car float was raised on or about June 12 or 13, 1985. It was placed on a small dry dock. It was then repaired and placed back in the water until removed by Plaintiff in August, 1985. Defendant seeks dock charge of $100 per day from Friday, June 28, 1985 to August 11, 1985.

There is no evidence that the Plaintiff ordered the repairs or arranged for the use of Defendant's dry dock or wharfage. There is evidence that the Plaintiff knowingly accepted the benefits of the Defendant's services and facilities.

Although the Defendant assured the Court that the action was based solely on the asserted negligence of the Plaintiff, the Defendant seeks to recover $86,665.33 for the cost of raising and repairing the barge, $4,000 for the use of its crane, sixty-seven days of wharfage at $100 per day or $6,700, and the value of the use of a large dry dock which was blocked by the sunken barge for four days of $6,558. The Defendant asserts that it is entitled to be paid for the services it rendered to Plaintiff in the salvage effort because the Plaintiff has accepted the benefit of those services.

The Plaintiff was content to make one effort to raise the barge after it sank near a bulkhead in Defendant's shipyard. The effort was unsuccessful and the Plaintiff thereafter abandoned the project. Since the barge was a hindrance to Defendant in the operation of its shipyard, it was necessary for the Defendant to expend time and effort and funds to remove the obstacle. The Defendant thereafter made two attempts to raise the barge. It was successful on the second try. It was then necessary, based on the uncontroverted evidence, to place the barge in a dry dock to make repairs that would enable the barge to float. While the barge was sunk, a large dry dock owned by Defendant was blocked, causing Defendant further financial loss. After the barge was made somewhat watertight, it was necessary to provide dock space for it. The total cost of these services and materials is $103,923.33. The Plaintiff regained possession of the barge after, in its action filed in this Court, on June 28, 1985 it obtained an order dated July 26, 1985 which permitted it to take possession after August 5, 1985. The Plaintiff was also authorized in the order to inspect the barge prior to August 5, 1985.

The Plaintiff benefited from the materials and services which were provided by the Defendant. Plaintiff knew or at least ought to have known that the services were required. The Defendant really had no other alternative than to render the services or continue itself to suffer losses in its own business. The Plaintiff accepted the barge back after an opportunity for an inspection. The reasonableness of the charges now sought by the Defendant is not in question.

The opinions dealing with liability for the acceptance of benefits which a party ought to know are rendered with the expectation of compensation are legion. The rule is stated at 66 Am.Jur.2d 968 § 24:

In the absence of anything to indicate a contrary intention of the parties, where one performs for another a useful ser-

vice of a character that is usually charged for and such service is rendered with knowledge and approval of the recipient, who either expresses no dissent or avails himself of the service rendered, the law raises an implied promise on the part of the recipient to pay the reasonable value of such service. The general rules is that where services are rendered by one person for another, and are knowingly and voluntarily accepted, without more, the law presumes that such services were given and received in the expectation of being paid for, and implies a promise to pay their reasonable worth. The acceptance of services under such circumstances warrants an inference of a promise to pay therefor, because it is conduct which justifies an understanding by the promisee that the promisor intended to make a promise, which is one way in which a promise may be made.

Thus the Defendant is entitled to recover from Plaintiff the reasonable value of its services and goods provided to Plaintiff following the sinking of the barge. This amount, according to the evidence is $103,-923.33.

■ In Count I of its amended counter-claim, Defendant seeks damages contending that the sinking of the barge and damage to its crane was due to the Plaintiff's negligence or the vessel's unseaworthy condition. The legal theories which Defendant argues are two: (1) that Plaintiff negligently performed a contractual obligation, to wit, assurances that the pad eyes were adequate to the task and that the barge was watertight, and (2) the negligent giving of false information to the same effect.

It is agreed by the parties that the damage to the crane is in the amount of $255,-000. It is a matter of considerable disagreement as to who is responsible for that damage. The Defendant's argument is that the crane was damaged because the Plaintiff failed to provide adequate pad eyes for affixing the leads from the crane to the barge and also failed to seal a number of hatches on the deck of the barge.

The Defendant's argument is that when the barge was righted, water rushed in through open hatches, causing the barge to sink, that an emergency developed which caused the crane operator to "walk" the barge in by moving the crane backward and changing the angle of the boom, in an effort to bring the barge as close to the bulkhead as possible to make salvage easier. The pad eye failed and the resultant strain caused the crane boom to buckle. The Plaintiff seems to suggest that the crane buckled during the process of righting the barge but this possibility appears quite unlikely.

The credible and undisputed physical evidence was that the barge was turned right side up before it sank. The unavoidable conclusion is that the pad eye did not fail in the effort to right the barge but failed in the effort to bring the righted barge closer to the bulkhead while it was sinking. Only one of the pad eyes failed. The boom on the crane buckled without affecting the integrity of the remaining pad eye. The real issue is, assuming that the Plaintiff was negligent for failure to insure that the barge was watertight before it was "picked" by the crane and was responsible for the integrity of the pad eye, were the failures of the Plaintiff the proximate or foreseeable cause of the Defendant's damages.

The Defendant admits that it was hired to provide a crane to right the barge. The crane was operated under the sole and complete control of the Defendant. There is no evidence to suggest that the Plaintiff had any particular knowledge that the crane might be used to bring the water-laden barge closer to the bulkhead in order to make salvage easier. The decision to use the crane in that fashion was solely and entirely the decision of the Defendant. The Defendant contends that the Plaintiff must take responsibility for emergency conditions which arose and to which its employees reacted. This argument says too much, since the Defendant was hired in the first place because of its possession of, and necessarily presumed ability to operate, a crane of the magnitude used. De-

fendant could just as well have allowed the water-laden barge to sink at the point where it was turned right side up rather than try to pull it closer to the shore. That determination was Defendant's alone, and was neither foreseeable nor predictable by the Plaintiff. "Events too remote to require reasonable prevision need not be anticipated." *Brady v. Southern Ry. Co.*, 320 U.S. 476, 483, 64 S.Ct. 232, 236, 88 L.Ed. 239 (1943). Therefore, the negligence, of the Plaintiff, if any, was not the proximate cause of the Defendant's damage, insofar as the crane is concerned.

> The law is generally stated, as follows: "... in order to warrant a finding that negligence ..., is the proximate cause of an injury, it must appear that the injury was the natural and probable consequence of the negligence (sic) ... act, and that it ought to have been foreseen in the light of the attending circumstances."

*Milwaukee, and Saint Paul Railway Co. v. Kellogg*, 4 Otto 469, 94 U.S. 469, 475, 24 L.Ed. 256 (1876). One illustration of this oft quoted axiom is found in *Sinram v. Pennsylvania R. Co.*, 61 F.2d 767 (2d Cir. 1932). Seven days after a collision with Defendant's tug when the barge carried no cargo, the Plaintiff's barge sank after being loaded with coal. The barge owner had not inspected the barge for damage above the waterline in the interim. The court (L. Hand) limited the plaintiff to damages above the waterline caused by the collision. The court in part stated 61 F.2d at 771:

> "In the case at bar it appears to us that the master of the No. 35, in approaching the barge at too great speed, or at the wrong angle, need not have considered the possibility that if he struck her, she might be injured, that her bargee might be so slack in his care of her as to let her be loaded without examination, and might so expose her to the danger of sinking. In the end this may seem merely a fiat, but that is always true, whatever the disguise."

Although the Defendant was not afforded seven days to make its decision as was the barge owner in *Sinram, supra,* its argument that an emergency was created, must fail. The basis of the emergency qualification of a standard of conduct is the circumstance "that the actor is left no time for adequate thought, or is reasonably so disturbed or excited that the actor cannot weigh alternative courses of action and must make a speedy decision based very largely upon impulse or guess." Prosser and Keeton on Torts, 196 (5th ed. 1984).

The emergency argument presupposes that the Defendant acted in a manner in which it could be found to have acted unwisely, or foolishly or even negligently. Otherwise there is no need to consider a less stringent standard of care. *St. Johnsbury Trucking Co. v. Rollins,* 145 Me. 217, 74 A.2d 465, 468–69 (1950); *Cincinnati & Suburban Bell Tel. Co. v. City of Cincinnati,* 84 Ohio App. 521, 85 N.E.2d 393, 397–98 (1949).

The Defendant's argument proceeds on the basis that Plaintiff failed to provide adequate pad eyes and hatch covers and failed to advise Defendant of the inadequacies, that Defendant relied on such representations with the result that the Defendant's crane was damaged. There were, however, no representations of adequacy which had anything to do with Defendant's choice to "walk in" the barge. The emergency was created by Defendant, after what Plaintiff sought, the righting of the barge, had been accomplished.[3]

Thus, judgment will enter dismissing the complaint and granting to Defendant judgment on the amended counterclaim in the amount of $103,923.33, interest and costs.

SO ORDERED.

---

**3.** As was said in *Overseas Tankship v. Morts Dock & Eng. Co.,* [1961] AC [1961] 1 All Eng. 404, 100 A.L.R.2d 928, 939, the so-called "wagon mound" case, "After the event even a fool is wise. Yet it is not the hindsight of a fool, but it is the foresight of the reasonable man which alone can determine responsibility."