DECISION
 I INTRODUCTION AND BACKGROUND Overview
The matter before the Court involves a contract dispute between Christos Erinakes, MD, (Plaintiff) and Nabil Zahreddine, MD, (Defendant). Plaintiff has brought suit against Defendant for amounts owed for various expenses over a three (3) year period. Plaintiff bases his claim on an allegation of a contractual relationship between Plaintiff and Defendant covering the years 1995, 1996 and 1997. Defendant denies any contractual liability and counterclaims for amounts allegedly owed to him by Plaintiff. The action was tried to the Court sitting without a jury over some twenty-seven days[1] on May 5, 6, 12, 13, 14, 28, 29, 30, and June 2, 3, 4, 9,10, 11, 12, 23, 24, 26, and July 2, 3, 15, 16, 17, 18, 21, 24, 29, and September 29, 2008. Over the course of trial, the Court heard from fifteen different witnesses[2]
and received one hundred and one (101) full exhibits from the Plaintiff and Defendant.[3] The Decision has been organized to provide *Page 2 
a background for the reader considering the large number of exhibits entered, the lengthy testimony, and the issues to be decided in the case
 Standard of Review
In a non-jury trial, the standard of review is governed by Super. R. Civ. P. Rule 52(a). The Rule provides that "in all actions tried upon the facts without a jury . . . the court shall find the facts specifically and state separately its conclusions of law thereon. . . ." Accordingly, "the trial justice sits as a trier of fact as well as of law." Hood v. Hawkins, 478 A.2d 181, 184 (R.I. 1984). In a non-jury trial, "determining the credibility of [the] witnesses is peculiarly the function of the trial justice." McEntee v. Davis, 861 A.2d 459, 464
(R.I. 2004) (quoting Bogosian v. Bederman, 823 A.2d 1117, 1120 (R.I. 2003)). This is so because it is "the judicial officer who [actually observes] the human drama that is part and parcel of every trial and who has had the opportunity to appraise witness demeanor and to take into account other realities that cannot be grasped from a reading of a cold record." In the Matter of the Dissolution of Anderson, Zangari Bossian, 888 A.2d 973, 975 (R.I. 2006).
Although the trial justice is required to make specific findings of fact and conclusions of law, "brief findings will suffice as long as they address and resolve the controlling factual and legal issues."White v. Le Clerc, 468 A.2d 289, 290 (R.I. 1983); Super. R. Civ. P. 52(a). Accordingly, a trial justice is not required to provide an extensive analysis and discussion of all evidence presented in a bench trial. Donnelly v. Cowsill, 716 A.2d 742, 747 (R.I. 1998). See alsoAnderson v. Town of East Greenwich, 460 A.2d 420, 423 (R.I. 1983). Competent evidence is needed to support the trial justice's findings. See Nisenzon v. Sadowski, 689 A.2d 1037, 1042 (R.I. 1997). *Page 3 
Moreover, the trial justice should address the issues raised by the pleadings and testified to during the trial. Nardone v. Ritacco,936 A.2d 200, 206 (R.I. 2007). However, a trial judge sitting as a finder of fact need not categorically accept or reject each piece of evidence or resolve every disputed factual contention. Notarantonio v.Notarantonio, 941 A.2d 138, 147 (R.I. 2008) (quoting NarragansettElectric Co. v. Carbone, 898 A.2d 87, 102 (R.I. 2006)).
 Summary Overview of Witness Testimony
This segment of the Decision is not intended to replace the comprehensive stenographic record nor the copious notes taken by the Court during the trial. The sole purpose of this particular section is to give a general summary and overview of the testimony of the various witnesses regarding the issues framed in the case. Specific portions of a particular witness's testimony and particular findings of fact and credibility determinations will be addressed in other parts of this Decision and may not appear in this summary overview.
Plaintiffs witnesses: 1. Walter Gendreau: Mr. Gendreau testified as an accountant who was formerly employed by the Plaintiff. He testified that he managed cash disbursements and receipts, did not have overall responsibility for the practice, but had management oversight. He had limited interaction with vendors, paid bills and constructed the general ledger according to his testimony. He stated that he worked with Defendant on occasion and showed Defendant where documents were located. Several of the exhibits in evidence were introduced through Mr. Genrdreau.
 2. Cecelia Louise Seippel: Ms. Seippel testified as a former employee of Plaintiff and a former employee of Lighthouse Medical Management. She testified that she worked on reports with Mr. Gendreau and gave Mr. Gendreau a monthly report of the medical practice. She testified that each doctor had his own bank account and she testified as to how the lab[4] procedures worked at the medical practice. *Page 4 
 3. Judith Aronson: Ms. Aronson testified as a former employee of the Plaintiff. She stated she was the office manager responsible for payroll, hiring, firing, and setting up procedures. She testified that she interacted with Defendant quite often and also with Mr. Gendreau. She testified that she put documents relating to the medical practice onto the computer for Mr. Gendreau. She testified that she was assigned to gather documents together for Defendant dealing with deliveries performed by Defendant. She testified that after compiling the list of deliveries, the list was placed on the computer. She further testified that the list was changed numerous times by Defendant. She testified that, at one point, she became aggravated with Defendant and all the changes to the list she was directed to make by the Defendant. She testified that she had gone to Plaintiff to advise him about and complain about the changes and was told by Plaintiff to do what Defendant asked. She testified that once all changes were made, both doctors told her to send the list to the hospital.
 4. John Ledoux: Mr. Ledoux testified as a C.P.A.,(Certified Public Accountant). He testified that Plaintiff is his client and Mr. Gendreau was a former employee of his firm. He described Mr. Gendreau as the internal accountant for Plaintiff. He testified as to his efforts to arrive at a complete understanding between doctors as to what constituted expenses and how the calculations should be made under the agreements covering the relationship between doctors. Several exhibits were admitted during Mr. Ledoux's testimony.
 5. Dr. Nabil Zahreddine: Dr. Zahreddine was called as an adverse witness by Plaintiff. He testified that he signed the contracts (Plaintiffs Ex.'s 1, 2, and 3). He testified that he did not protest Plaintiffs Ex. 46b with the hospital nor did he raise questions with Plaintiffs Ex.'s 46c or 46d. He also testified that Plaintiffs Ex.'s 46f, 46g, and 46h are accurate. Dr. Zahreddine testified as to his understanding of what the expenses (that he would contribute to) consisted of and denied ordering Ms. Aronson to make any changes to the list of his deliveries. Dr. Zahreddine testified that he was not allowed access to the books and ledgers of the medical practice and claims he was told that he could not bring in his own accountant to go over the books.
 6. Dr. Christos Erinakes: Dr. Erinakes testified as to the recruitment process and reasons therefore related to bringing Dr. Zahreddine to the state. He testified as to the makeup of the contracts and his expectations. He testified as to the various agreements and exchanges with Defendant related to the medical practice. He testified that he never denied Dr. Zahreddine the opportunity to get an accountant to review the books of the medical practice.
 7. David Terry: Mr. Terry testified as the Chief Financial Officer of Care New England Health Systems. This is the parent company for Kent County Memorial Hospital, (hereinafter simply Hospital). He testified that he was not familiar with the background details of the three-way agreement as it was already in *Page 5 
existence when he began work at the hospital. He testified that he used the agreement when the hospital accounting department had to come up with final settlement figures for Defendant. Mr. Terry testified that he did not perform any of Plaintiff s calculations and Plaintiff was not involved in the final settlement between Defendant and the hospital. He testified as to various components of the final settlement between Defendant and the hospital.
Defendant's witnesses: 8. John Reis: Mr. Reis testified as a self-employed C.P.A., (Certified Public Accountant). He sat through Mr. Gendreau's testimony but not Mr. Ledoux's testimony. He gave his opinion based upon the documents in evidence and what he heard from Mr. Gendreau as to the proper calculations and final figures as related to the relationship between Plaintiff and Defendant for the three years covered by the contracts.
 9. Patricia Johnson: Ms. Johnson testified as a former employee of the medical practice. She testified that she performed general office duties and mainly worked the phones at the beginning of her employment. She testified that she reported to Ms. Aronson. She testified that when patients called, Ms. Aronson instructed her that unless the caller specifically asked for the Defendant, the caller was to be assigned to Plaintiff. She testified that she followed instructions and later told Defendant about the instruction she received.
 10. Dr. Nabil Zahreddine: Dr. Zahreddine testified during his own case in chief. He testified about the arrangements between himself and the Plaintiff relative to payments for the deliveries he performed for Plaintiff. He denied that he ever agreed to any part of Plaintiffs Ex. 4 or Plaintiffs Ex. 4a (Ledoux Memo relative to expenses and proper calculations of the financial details of the arrangement). He testified at length regarding the lab tests he performed and further testified that he was not certified to perform the CLIA tests.
 11. Sandra PI ante: Ms. Plante testified that she works for a medical billing company and she came to court at the request of Defendant. She testified that when a certified lab performs tests that the payment for those tests goes to the facility. She admitted on cross-examination that she was not familiar with Plaintiffs medical practice and further admitted that she was unsure if the testimony about the Plaintiffs medical practice lab receiving payment and then placing that payment into Defendant's account was improper.[5]
Rebuttal witnesses: 12. Donna Manni: Ms. Manni testified as a rebuttal witness for the Plaintiff. She specifically testified as to her experience with the telephone answering systems of Plaintiffs medical practice. She explained how any callers were offered *Page 6 
options as to whether they would like to be scheduled with Plaintiff, Defendant, or one of the midwifes. She specifically denied ever being told to push patients one way or the other.
 13. Laura Burwell (Braga): Ms. Burwell testified as a rebuttal witness for Plaintiff. She testified that she answered the telephones for the Plaintiffs medical practice on occasion, and she would specifically offer Defendant's services to callers, telling them that Defendant was available to see them right away. She testified at length about her activity as a lab technician for the medical practice and how the tests would be ordered and billed for. She testified that she participated in the billing and would actually generate billing including the patient's name and the doctor who ordered the tests.
 14. Dr. Christos Erinakes: Dr. Erinakes testified as a rebuttal witness as well. He testified as to other coverage arrangements he employed with other physicians. He also testified that up to this point, he had paid all of Defendant's expenses affiliated with the medical practice.
 15. Nancy Hines: Ms. Hines testified as a rebuttal witness for Plaintiff. She testified she worked for the Rhode Island Department of Health and oversees the CLIA[6] certification procedure in the state. She confirms that Plaintiffs lab is CLIA certified. She explained the implications of the certification process.
 16. Dr. Mauro Colavita: Dr. Colavita testified as a rebuttal witness for Plaintiff. He testified that he is currently in a coverage[7]
arrangement with Defendant. He testified that the normal arrangement is to give time for time while the doctor who is the primary doctor collects the fee. Coverage is generally arranged within what is called a "coverage group." Dr. Colavita admitted on cross-examination that the "time for time" arrangement is premised on equal time coverage. He admitted that if the arrangement was lopsided (one physician giving more time than another) the premise would not apply.
 17. Donna Falso: Ms. Falso testified as a rebuttal witness for Plaintiff over Defendant's objection that her testimony was not truly rebuttal. She testified that she used to work for Lighthouse Medical Management and the company is *Page 7 
now named Ingenix Caretracker. She testified that she is a compliance officer for the company at this time. She testified that she has familiarity with Plaintiffs Ex. 46i and testified it would appear to reflect payment procedure to Defendant. She admitted on cross-examination that the data could possibly be tracking numbers and not billing. She testified that notwithstanding the information that appears on Plaintiffs Ex. 46i, she does not know exactly who the payment check for those services was made out to and where that check was deposited.
 18. John Ledoux: Mr. Ledoux testified as a rebuttal witness for Plaintiff. He testified as to certain discrepancies in the testimony of John Reis including certain expense items that Mr. Reis wrongfully included. He testified as to how he calculated new bottom line totals in the specific areas of his testimony.
 19. Dr. Nabil Zahreddine: Dr. Zahreddine testified as his own rebuttal witness. He testified that he was involved in a coverage arrangement formerly with Dr. Colavita where Dr. Colavita charged for the whole delivery fee. (Dr. Colavita testified earlier on cross-examination that he could not remember this situation). He testified these situations are common where there is no corresponding agreement. The Pleadings and Burden of Proof
Plaintiff filed his original Complaint on March 30, 2001. He alleged a contract with Defendant beginning on or about January 1, 1995 under which Defendant "was engaged to provide obstetrical and gynecological consultation and collaboration services"[8] to Plaintiff. Plaintiff further alleged that Defendant was to "receive the proceeds of his own billing to patients but was required to make payment to [Plaintiff] for rent and to pay a portion of [Plaintiffs] fixed expenses and variable overhead expenses as defined in said contract, copy attached."[9]
Plaintiff attached a copy of the contract between Plaintiff and Defendant which has been entered as Plaintiffs Ex. 2 in this case. The Complaint alleged an agreement for each doctor to provide "coverage"[10] during the *Page 8 
other's period of vacation.[11] Plaintiff alleged a breach by Defendant in making the payments due under the contract. Plaintiff also specifically alleged that he provided eleven weeks of coverage to Defendant while Defendant has refused to provide coverage in return. Plaintiff specifically demanded compensation for the eleven-week period described.[12] The Plaintiff clearly has the burden of proof in a breach of contract action to demonstrate that a defendant has breached a contract. Gorman v. St. Raphael Academy, 853 A.2d 28, 37 (R.I. 2004); See also Dias v. Vieira, 572 A.2d 877 (R.I. 1990). It is a well accepted principle of law that damages also must be proved. They are not to be presumed. Blake v. Robertson, 94 U.S. 728, 733 (1876), cited with approval in Tom Shaw, Inc. v. Derecktor, 639 F.Supp. 1064, 1067 (D.R.I. 1986). The rule on contract damages is designed to place an injured party in as good a position as he would have been in had the contract been fully performed as promised. 5 Corbin on Contracts, § 992 (1964); cited with approval in R.I. Bridge Turnpike Authority v. BethlehemSteel Corp., 119 R.I. 141, 166, 379 A.2d 344, 357 (1977). Plaintiff is required to prove the damages he has alleged by virtue of his complaint by a fair preponderance of evidence. See e.g. Tom Shaw, Inc. v.Derecktor, supra.
Defendant admitted in part and denied in part the complaint's allegations in his Answer filed on May 15, 2001. Defendant alleged that Plaintiff had failed to mention other agreements that modify the contract relied upon by Plaintiff. (Plaintiffs Ex. 2). Defendant countered that other agreements (Plaintiffs Ex.'s 1 and 3) modify the *Page 9 
obligations described by Plaintiff in his complaint.[13] Defendant specifically alleged in his Answer that he had already paid the Plaintiff the sum of "approximately one-hundred twenty thousand ($120,000) dollars."[14] Defendant further alleged that Plaintiff did not pay Defendant certain sums due and owing under the contract "which sums exceeded any sums due and owing to [Plaintiff], and Defendant "had no obligation to pay [Plaintiff] where the net due and owing was from [Plaintiff] to [Defendant]. Moreover, Defendant alleged that the sums Plaintiff claimed were "materially and substantially inflated figures which were not accurate."[15] Defendant flatly denied Plaintiffs allegation regarding the eleven weeks of coverage in Count II of the complaint.
Defendant set forth several affirmative defenses including laches, estoppel, waiver, detrimental reliance, and unclean hands.[16]
Defendant also asserted that he had an "offset, in whole, in part, or in excess of any obligation he had to [Plaintiff]."[17] Defendant has the burden of proof to establish his affirmative defenses. RidgewoodHomeowners Association v. Mignacca, 813 A.2d 965, 972 (R.I. 2003). Other affirmative defenses alleging failure to state a claim upon which relief can be granted, inadequate and improper service of process, and failure to join an indispensable party were not seriously addressed during the trial and the Court will not seriously consider them from this point on.
Defendant has alleged two counterclaims in his Answer. In Count I of his Counterclaim, Defendant alleged a contract with Plaintiff wherein Plaintiff allegedly agreed to pay overhead and other expenses of Defendant and also be responsible to *Page 10 
Defendant in part for a salary guarantee. Defendant alleged that Plaintiff is also responsible for unpaid coverage fees for the three years of the agreement. Defendant also alleged fraud in Count II of the Counterclaim in essence that Plaintiff, personally and through others, made "knowingly false statements to [Defendant], did threaten legal action and did otherwise attempt to induce [Defendant] to make payments which, upon information and belief, [Plaintiff] knew or should have known were not due and owing to [Plaintiff]."[18] Defendant further alleged that because of Plaintiff s fraud, Defendant has "incurred expenses, suffered emotional distress, and otherwise been damaged."[19] Defendant demands both compensatory and punitive damages on Count I of the Counterclaim. Defendant bears the burden of proof of his claims and damages just as Plaintiff does on his own claims. However, except for payments allegedly due under the contracts described, Defendant has not seriously addressed the expenses, emotional distress or other damages alleged.[20] The Court will not entertain the damages Defendant asserted in Count II of his Counterclaim considering that the entire record is meager or nonexistent as it relates to those matters.
Once trial was underway, Plaintiff moved to amend his Complaint on May 12, 2008. The essence of the amendment sought to have Defendant pay a proportionate share of all overhead of the medical practice, specifically including the midwifery portion of the practice. The Amended Complaint specifically alleged that Defendant was required to make overhead payments to Plaintiff in the amount determined by Plaintiffs accountant, [21] and further alleged that Defendant was in breach of his obligation to make *Page 11 
such payments to Plaintiff.[22] The Amended Complaint contained a second count (Count II) alleging that Plaintiffs accountant prepared a Memorandum[23] in January, 1995 setting forth a methodology proposed by the accountant "and implicitly accepted by [Defendant] whereby Plaintiffs income guarantee to Defendant amounted only to 17.5% of Defendant's gross compensation exclusive of expenses and Defendant would pay a percentage of Plaintiffs overhead "exclusive of the midwifery payroll."[24] Plaintiff alleges that Defendant was in breach of his obligation to make payment as modified by the Ledoux Memorandum (Plaintiffs Ex.'s 4 and 4a). Plaintiff denied the allegations of Defendant's Counterclaim in the Amended Complaint and raised the affirmative defenses of laches, estoppel, waiver, detrimental reliance, unclean hands, and specifically raised offset in the same manner as Defendant.[25] As the parties were engaged in a non-jury trial, the Court allowed the amendment over Defendant's vigorous objection.[26]
The Plaintiff, as already discussed, must carry the burden of proof relative to the claims arising out of the Amended Complaint and the affirmative defenses related thereto.
Given the precise context of Plaintiffs Amended Complaint, it is clear that Plaintiff is still alleging a breach by Defendant of Defendant's obligation to pay overhead expenses "of the practice and midwifery service" to Plaintiff[27] It is unclear however, what has become of Plaintiffs original allegation that Defendant was in breach of his obligation to pay overhead expenses only related to the medical practice and not including the midwifery service to Plaintiff. Except as specifically amended, Plaintiff has *Page 12 
not included the identical allegation in his Amended Complaint. He has not pleaded the Counts in the original Complaint in the alternative within the context of the Amended Complaint. Furthermore, Plaintiffs Amended Complaint is devoid of any specific allegation relating to Defendant's failure to provide eleven weeks of coverage to Plaintiff. Generally speaking, an amended pleading is a substitute for the original and supersedes it and the original no longer performs any function in the case. See Zito v. Cassara, 109 R.I. 112, 113 at footnote 1,281 A.2d 303 (1971). Attempting to frame the Court's query as it relates to the Amended Complaint in another way, if the Court finds that the contracts or agreements between Plaintiff and Defendant do not obligate the Defendant to pay a proportionate share of the overhead expenses ofboth the medical practice and the midwifery service, is the Plaintiff then precluded from attempting to recover solely for Defendant's share of the overhead expenses of the medical practice not including the midwifery service? Has the Plaintiff advanced an all or nothing proposition by amending his complaint? This Court is required to construe the pleadings so "as to do substantial justice." See
Super. R. Civ. P. Rule 8(f). Accordingly, the Court will undertake an examination of the contracts and construe them within the context of this entire case considering the volume of the record. In sum, the Court will not place the Plaintiff in an "all or nothing" position with respect to Defendant's obligation to pay expenses. However, it does appear that Plaintiff has abandoned his claim for the eleven week period that Plaintiff alleges Defendant failed to provide "coverage"[28] as that specific claim has not been made a part of Plaintiff s Amended Complaint. Notwithstanding, Plaintiff at one point did testify (with no objection) that Defendant had gone to Lebanon, and Plaintiff "did eleven (11) weeks of coverage." (Plaintiffs testimony on direct examination *Page 13 
occurring on June 12, 2008 afternoon session.) The issue of damages for the eleven weeks of coverage was never seriously address during trial or in the post trial memorandums. The Court will not seriously consider that issue from this point on.
 II COMPUTATIONS ANALYSIS The Contracts and their Construction
Both parties agree and admit that they signed three written instruments at the inception of the relationship. (Plaintiffs Ex.'s 1, 2, and 3). A word on each instrument is in order.
 Plaintiffs Ex. 1
Plaintiffs Ex. 1 is an agreement between Plaintiff, Defendant, and Kent County Memorial Hospital, (hereinafter simply Hospital). The agreement is in the form of a five-page letter on Hospital stationary addressed to Defendant at 20 Highpath Road in Windsor, Connecticut. The first page is dated December 28, 1994. The last page contains three signatures beginning with John J. Hynes as President of the Hospital and including Plaintiffs and Defendant's signatures. (Hereinafter referred to as the "three-way agreement"). There is no date on the last page indicating the date(s) the signatures were placed on the last page. The agreement opens with a paragraph indicating "[T]he purpose of this letter is to set forth our understanding with regard to the financial terms of your proposed affiliation as a member of [Hospital] staff specializing in OB/GYN." (sic at paragraph 1). The Court finds that the agreement resulted from the recruitment efforts of Plaintiff to find another physician to assist both Plaintiff and the Hospital staff in the area of obstetrics and gynecology. (OB/GYN). *Page 14 
The essence of the three-way agreement provided a guarantee of a "minimum annual level of compensation of $200,000 during the term of the agreement" and provides that the Hospital will "advance funds monthly asneeded for reasonable practice expenses in the following categories: 1) Rent; 2) Variable Expenses; and 3) Direct and Fixed Expenses." (Agreement p.l, paragraph 3). The agreement goes on to provide, "[F]rom January 1, 1995, through November 30, 1995, the sum of Rent and Variable Expenses is defined as a fixed sum of $10,000 monthly." Id. (emphasis added).
 Page 2 of the agreement describes reasonable expenses for both rent and Variable Expenses during the second and third years of the agreement as follows:
 From January 1, 1996, through December 31, 1997, a) reasonable expenses for Rent, including all property-related costs, i.e. lease expenses, equipment rental, repairs, maintenance, sewer and water, snowplowing and landscaping will be limited to $1,500 monthly; and b) reasonable expenses for Variable Expenses including reasonable expenses for answering services, subscriptions, payroll, payroll taxes, insurance, medical supplies, office supplies, heat, electricity, gas, cleaning, laundry, and telephone will be limited to your share of the reasonable overhead variable expenses of Christos Erinakes, M.D., Toll Gate OB-GYN Midwifery Service, and you (collectively the "Practice") as calculated each month. For the purpose of this calculation, your share of the reasonable variable overhead expenses will be proportionate to your share of the revenues of the Practice as calculated each month, (p. 2 at paragraph 1).
The agreement also discusses and defines Direct and Fixed Expenses for the second and third years of the agreement (part of the Hospital Advances as indicated at p.l, paragraph 3) as follows:
 From January 1, 1995, to December 31, 1997, the Direct and Fixed Expenses will be limited to reasonable expenses for health and dental insurance for you and your family, professional liability coverage in the amount of $1,000,000 per claim and $3,000,000 in the aggregate of claims in any policy year on either a claims made or occurrence coverage basis, (in the event you elect claims-made coverage, commensurate tail coverage will be provided: a) at any time of *Page 15 
termination of this agreement, or b) at the time you change from claims made to occurrence during the terms of this agreement; term life insurance in the amount of $200,000, disability insurance, educational meetings and conferences, professional dues, and professional licenses. Health and dental insurance, and disability insurance and life insurance shall be purchased through the Hospital for the same coverages (sic) as are available to Hospital employees except as specified above, and except to the extent coverage is not available through the Hospital, substantially equivalent coverage shall be purchased at market rates. The term of this Agreement shall begin on January 1, 1995, and end on December 31, 1997, unless earlier terminated by death, disability, or as otherwise provided herein, (p. 2 at paragraph 2).
The agreement contains detailed sections on computing the Hospital advances for expenses as well as compensation, (last paragraph on p. 2 with first 3 paragraphs on p. 3). (discussed, infra). The agreement also contains a provision as to how to deal with accounts receivable at the end of the agreement, (p. 4, paragraph 3) and a compensation guarantee allocated between the Hospital and Plaintiff, (p. 4 at 3rd
full paragraph on page). Pursuant to the terms of the compensation guarantee, the Hospital is responsible for 82.5% of the compensation guarantee, and the Plaintiff is responsible for the remaining 17.5%. Id.
The agreement has other details including, but not limited to termination contingencies, audit and accounting procedures, and relocation expenses that do not factor significantly into the issues pending before the Court.
 Plaintiffs Ex. 2
At the inception of the relationship, the parties realized they needed an agreement allocating the "expenses" as between the parties as they related to the medical practice which were not a part of the Hospital expenses but related solely to the physicians' relationship with each other and Plaintiffs medical practice, (hereinafter "two-way *Page 16 
reement"). Both Plaintiff and Defendant admit they entered into the agreement identified as Plaintiffs Ex. 2. Plaintiffs Ex. 2 is a seven page document containing six pages of text with an additional exhibit attached to same which purported to list fixed expenses and variable expenses. The parties admit their signatures appear on pp. 6 and 7. Those pages are dated January 13, 1995 and are witnessed by Cecelia Seippel but the first paragraph of the agreement clearly indicates that January 1, 1995 is the effective date of the agreement. Plaintiffs Ex. 2 indicates that Plaintiff retains the Defendant on an independent contractor basis, (p.l, paragraph 1). (The agreement refers to the Plaintiff as the "Owner" [of the medical practice] while Defendant is referred to as "Contractor" [the independent contractor] providing services to the practice).
The agreement provides that Defendant shall receive the proceeds of all billings generated by the Defendant, (p.l paragraph 1). The agreement also provides that Defendant shall be required to "assume" a share of Plaintiff s expenses. The specific language is set forth in paragraph 1.1 of Plaintiff s Ex. 2 as follows: (in relevant part)
 The Contractor [Defendant] shall be required to assume a share of the Owner's [Plaintiffs] expenses. For the contract year beginning on the Effective Date hereof, the contractor shall pay Owner the sum of $10,000 per month to cover his share of all overhead expenses. For contract years beginning on the first and second anniversary of the Effective Date, Contractor shall pay Owner on a monthly basis (i) Rent in an amount equal to Fifteen Hundred Dollars ($1,500) per month, (ii) one-third (1/3) of the Fixed Expenses set forth on Exhibit A hereto, excluding Rent (the "Fixed Expenses") and (iii) Contractor's share of the variable overhead expenses of the Owner set forth on Exhibit A hereto (the "Variable Expenses"), which share will be proportionate to Contractor's revenues for a given period relative to the revenues of the Owner and Tollgate OB-GYN Midwifery Service (an affiliate of the Owner, hereinafter referred to as the "Midwifery Service") with respect to the same period. For all subsequent contract years, the Contractor shall contribute to the Owner's expenses on a monthly *Page 17 
basis: (i) as Rent, one-third (1/3) of the Owner's expenses related to the Building which is the site of the Practice located at 176 Tollgate Road (the "Building"), as determined by the accountant then retained by the Owner, (ii) one-third (1/3) of the Fixed Expenses, excluding Rent and (iii) Contractor's proportionate share of the Variable Expenses based on relative revenues set forth above. . . . (Plaintiffs Ex. 2, paragraph 1.1).
The specific expenses, as set forth on the exhibit appended to Plaintiffs Ex. 2, ("Exhibit A Overhead Expenses") are listed in column form:
 Fixed Expenses
 — Rent
 — Equipment Rental from January 1995 until June 1995
 Variable Expenses
 — Payroll
 — Payroll Taxes (Employees) Insurance
 — Medical Supplies Office Supplies
 — Payroll Services
 — Laundry Service Advertising
 — Electricity Gas
 — Building Cleaning Telephone
Plaintiffs Ex. 2 also contains a provision expressly providing "[t]his Agreement may be amended only by a writing signed by each of the parties." (Plaintiffs Ex. 2 at p. 5, paragraph 11).
 Plaintiffs Ex. 3
Plaintiffs Ex. 3 is a one-page document entitled "Addendum" and admittedly signed by Plaintiff and Defendant. The agreement indicates it was signed on January 13, 1995 and the name Cecelia L. Seippel appears as a witness. This particular agreement (Plaintiffs Ex. 3.) references the above described "two-way agreement" between Plaintiff and Defendant. By its terms, Plaintiffs Ex. 3 purports "retroactively adjust" Defendant's *Page 18 
expense obligations during the first contract year in lieu of the stated $10,000 per month that Defendant was obligated to pay Plaintiff for expenses during the first contract year, (1995).
Plaintiffs Ex. 3 purports to establish the same expense calculation for Defendant's obligation in the first year of the contract, January 1, 1995 through December 31, 1995) as the second and third years of the contract. Exhibit 3 specifically states in pertinent part:
 . . .where [Defendant's] expense obligation for said year is calculated on the following basis: (i) Rent in an amount equal to Fifteen Hundred Dollars ($1,500) per month, (ii) one-third (1/3) of the other Fixed Expenses of the Practice (as per exhibit (sic) A of the agreement,) and (iii) [Defendant's] proportionate share of the Flexible Expenses (as per exhibit A of the agreement) based on [Defendant's] revenues generated during said contract year relative to the revenues of the [Plaintiff] and the Midwifery Service generated during said year. (emphasis on different terms from those employed in Plaintiffs Ex. 2 is intentional).
The parties testified that their intent in executing Plaintiffs Ex. 3 was to calculate the expenses for the first year in the exact same manner as the second and third years of the agreement. While the language is very similar, the language is not identical as depicted with the bold, italicized and underlined text above. Furthermore, there is a new term introduced into the particular language of the agreements at this time. The word "Flexible Expenses" is used referring to "exhibit A of the agreement." The Court finds as a fact that this refers to the Defendant's Ex. A attached to the two-way agreement identified as Plaintiffs Ex. 2. An examination of said attachment reveals that Fixed Expenses and Variable Expenses are set specifically set forth on said attachment and this is certainly different from the words "Flexible Expenses." *Page 19 
A cursory examination and comparison of the three-way agreement (Plaintiffs Ex. 1) and the two-way agreement (Plaintiffs Ex. 2) reveals that there are expenses set forth on Plaintiffs Ex. 1, namelyanswering service, subscriptions, and heat (see Plaintiffs Ex. 1 at p. 2, paragraph 1) (emphasis added) that do not appear in Plaintiffs Ex. 2. Additionally, there are certain expenses set forth in Plaintiffs Ex. 2, namely Office Supplies, Payroll Services, and Advertising (See
Plaintiffs Ex. 2, at p. 7-Defendant's Ex. A attachment — under Variable Expenses) (emphasis added) that do not appear in Plaintiffs Ex. 1.
 The Court's General Conclusions of Law
Rhode Island has long held that parties are bound by the plain terms of their contract. Vincent Co., v. First National Supermarkets,Inc., 683 A.2d 361, 363 (R.I. 1996). As a general rule, instruments executed at the same time for the same purpose and in the course of the same transaction are to be considered as one instrument and are to be read and construed together. Stanley-Bostitch, Inc., v. RegenerativeEnvironmental Equipment Co., Inc., 786 A.2d 1063, 1065 (R.I. 2001). In construing a contract, the primary rule is for the court to ascertain and give effect to the mutual intent of the parties. Cochrane v.Lorraine Mfg. Co., 52 R.I. 17, 24 (1931). See also DTP., Inc., v. RedBridge Properties, Inc., 576 A.2d 1377, 1381 (R.I. 1990) (If the intention of the parties can clearly be discerned from the language of a written contract, the words of the contract are assigned their plain and ordinary meaning.). Under Rhode Island law, a court is duty bound to construe contractual terms in the context of the contract as a whole.See In re Newport Plaza Associates, L.P., 985 F.2d 640, 646 (C.A. 1 (R.I.) 1993), citing Woonsocket Teachers' Guild, Local 951 v. SchoolCommittee of the City of *Page 20 Woonsocket 117 R.I. 373, 367 A.2d 203, 205 (1976). The provisions of a contract are not to be construed separately as isolated items, but parts of the contract are to be read together as related elements of a unitary business undertaking to the end that the meaning of the parties to the transaction may be ascertained with as much certainty as the circumstances permit. U.S. v. P.J. O'Donnell Sons, Inc., 228 F.2d 162,164 (C.A. 1 R.I. 1955). Courts look to apparent intentions of the contracting parties when interpreting contracts. Ross-Simons of Warwick,Inc., v. Baccarat, Inc., 102 F.3d 12, 17 (C.A. 1 R.I. 1996).
Contract interpretations are a question of law and, it is only when contract terms are ambiguous that construction of the terms becomes a question of fact. Clark-Fitzpatrick, Inc./Franki Foundation Co. v.Gill, 652 A.2d 440, 443 (R.I. 1994). In situations in which the language of a contractual agreement is plain and unambiguous, its meaning should be determined without reference to extrinsic facts or aids. Jd. at 443. A court must find that a contract is ambiguous before it can exercise judicial construction. Capital Properties, Inc. v. State, 749 A.2d 1069,1081 (R.I. 1999). A contract is ambiguous only when it is reasonably and clearly susceptible of more than one interpretation. The Elena CarcieriTrust-1988 v. Enterprise Rent-A-Car Co. of Rhode Island, 871 A.2d 944,947 (R.I. 2005). If an ambiguity exists, the court may consider the construction placed upon the contract terms by the parties. Id at 944. Other conclusions of law will be set forth as appropriate in this decision.
 Finding of Ambiguity
It is clear to this Court that the precise words used in Plaintiffs Ex.'s 1, 2, and 3 all contain somewhat different descriptions of the term "expenses" as the term is used to *Page 21 
describe certain obligations of Defendant in making the computations necessary to determine any applicable amount of the salary guarantee under Plaintiffs Ex.1, any Hospital advances as described in Plaintiffs Ex.1, and any amounts due and owing to Plaintiff under the terms of the agreement. Testimony is before the Court from Plaintiff, Defendant, Walter Gendreau, and John Ledoux regarding the difference of opinion as to exactly what expenses should be included in the expense formula and exactly how the computations should be made in this regard. Walter Gendreau testified as to the data he was retrieving and compiling from the various books and ledgers of the medical practice and the meetings and conversations he had with Defendant relative to a mutual understanding of the issue. John Ledoux testified as to the creation of the "Ledoux memo" (see Plaintiffs Ex.'s 4 and Exhibit 4a) admitted over Defendant's objection. Defendant has, at all times, been adamant that he "never agreed" to the Ledoux memo and the Court is inclined to accept Defendant's testimony as the most credible on this particular issue. This testimony is buttressed by the testimony of Walter Gendreau and John Ledoux. While conversations between Defendant and Mr. Gendreau, and later between Defendant and Mr. Ledoux managed to narrow the precise meaning of what expenses were covered and how they were calculated, it is clear from all three men that Defendant never expressly agreed to the complete provisions of the Ledoux memo; and at one point, according to both Mr. Gendreau and Defendant, discussion of the issue regarding Plaintiffs Ex.'s 4 and 4a became heated and contentious and abruptly halted when Defendant's integrity was called into question by Mr. Gendreau.
There are three (3) particular items listed as "expenses" in Plaintiffs Ex. 1 that do not appear in Plaintiffs Ex. 2. Furthermore, there are three (3) particular items listed in *Page 22 
Plaintiffs Ex.2 that do not appear in Plaintiffs Ex.1. Additionally, the method of computing Defendant's expense obligation for the first year of the three-year arrangement was changed by a written mutual agreement (Plaintiffs Ex.3). It is also unclear to the Court from a reading of all three exhibits as to exactly what is meant by the term "payroll" insofar as determining exactly what employees were covered and what line items go into the calculation of payroll even after the particular employees are ascertained. The Court finds that such determinations will clearly have an impact in computing Defendant's overall obligation to Plaintiff and the correct "proportionate share of expenses" determination required by Plaintiffs Ex.1 (discussed infra). Plaintiff has also amended his Complaint once trial was underway to allege that payroll included all of the medical practice employees including those of the midwifery service as well as alleging that Defendant "impliedly accepted" the provisions of the Ledoux Memo (Plaintiffs Ex.'s 4 and 4a) in lieu of an obligation to pay a proportionate share of the expenses of the entire medical practice including the midwifery portion. Again, the result of the amendment would have the effect of increasing Defendant's obligation to the Plaintiff regarding expenses. Based upon the language used in the Plaintiffs Ex.'s 1, 2, and 3, the Court finds that the term "expenses" is reasonably and clearly susceptible of more than one interpretation.The Elena Carcieri Trust-1988, supra. The Court therefore finds that the agreement (as set forth in Plaintiffs Ex.'s 1, 2, and 3) (hereinafter collectively referred to as simply the "agreement" unless a specific reference to a particular reference is needed) between Plaintiff and Defendant is ambiguous. The precise meaning of the word "insurance" is capable of more than one interpretation. Does it mean casualty insurance? Health insurance? Workers' comp insurance?, or a *Page 23 
combination of all three? What exactly is meant by payroll? What specific employees are included? Is the profit sharing included? These are but a few of the questions upon an initial reading of the agreements.
Furthermore, the difference of interpretations as evidenced between Plaintiffs original Complaint and Amended Complaint only adds to the serious ambiguity contained in the contracts.
 The Expenses, Interpretations, and Ambiguities
When the provisions of a contract may be construed in different ways, the practice of the courts is to adopt the construction which is most equitable and which will not give to one party an unconscionable advantage over the other. Donelan v. Donelan, 741 A.2d 268, 270 (R.I. 1999). If an ambiguity does exist in a contract, the court will consider the construction placed upon the terms by the parties. Johnson v.Western National Life Insurance Co., 641 A.2d 47, 48 (R.I. 1994). An interpretation making an ambiguous contract fair and reasonable is preferred to an interpretation making it unusual and unreasonable.Wall Co. v. Imperial Printing and Finishing Co., 165 A. 898, 899 (R.I. 1933). A court will give the terms of a contract a reasonable construction and whenever the meaning of the words used by the parties is fairly susceptible to two constructions, the court will adopt that construction which is equitable to all parties rather than one which favors one party at the expense of the others. Gross v. Clark,43 R.I. 389, 113 A. 115, 118 (1921). Where a contract, as a whole, discloses a given intention, and certain words or clauses would, if taken literally, defeat such intention, they should be interpreted, if possible, so as to be consistent with the general intention. Massasoit Housing Corp., v.Town of North Kingstown, 75 R.I. 211, 216 65 A.2d 38, 40-41 (1949). In such *Page 24 
situations, the court should consider the situation and all accompanying circumstances to determine the meaning of the terms. Dial Media, Inc. v.Schiff 612 F. Supp. 1483, 1487 (D.R.I. 1985).
In the matter before the Court, numerous exhibits were introduced during the testimony of Walter Gendreau. The exhibits include various items relating to the medical practice including bills, cash disbursement reports, invoices, tracking and supply reports, reconciliations, general ledgers and payroll reports. Thereafter, the Plaintiff, through Mr. Gendreau's testimony, introduced Plaintiffs Ex. 43. Plaintiffs Ex. 43 was actually prepared by John Ledoux according to both Walter Gendreau and John Ledoux. Plaintiffs Ex. 43 is a spreadsheet where the data is organized in column form. In essence the document is a summary of the previous testimony and exhibits. Summary charts must be grounded in admissible evidence. See R.I. R. Evid.1006 and U.S. V.Davis, 261 F. 3d 1, 42 at note 37 (C.A.I R.I. 2001). It is not seriously contested that the Defendant had the ability to review and examine the documents before their submission to the Court. Notwithstanding, Plaintiff still introduced numerous exhibits as described above prior to his submission of the summary contained in Plaintiffs Ex. 43. Testimony by Walter Gendreau and John Ledoux demonstrate that after extensive discussions and after the drafting of Plaintiff s Ex.'s 4 and 4a, there were only four expense items which were left undecided. Those items were identified as Insurance — contents. Equipment repairs. Equipmentproperty tax and Cleaning. (See Plaintiffs Ex. 4a, p. 2) (emphasis added). Of those four items, Plaintiffs Ex. 43 shows a one-time expense for Insurance-contents of $3,052 for the year ending 12/31/95 with no further mention. Equipment repairs are carried for the first year and continue for six succeeding quarters; Equipment *Page 25 
property tax is not carried at all; and "cleaning" is not carried at all as a specific item on Plaintiffs Ex. 43 but "Laundry" is carried for the first year and Maintenance — contracts is carried for the first year and on six of the succeeding quarters. This Court finds and accepts the expenses set forth on Plaintiffs Ex. 43 as fair and reasonable, equitable to both parties, and consistent with the general intention of the parties at the time the contract was entered into between the parties. The expenses, for the purposes of this decision are found to be:
 • Accounting
 • Advertising
 • Electric
 • Employee Training
 • Equipment Repairs
 • Gas
 • Insurance — Contents
 • Insurance — Health
 • Insurance — Workers' Comp
 • Laundry
 • Maintenance — Contracts
 • Medical Supplies
 • Office cleaning
 • Office supplies
 • Payroll
 • Payroll Service
 • Payroll taxes
 • Pension administration
 • Postage meter
 • Professional fees
 • Profit sharing
 • Subscriptions
 • Telephones
 • Trash removal
This Court also rejects Plaintiffs claims contained in his amended complaint, inter alia, that Defendant's expense obligation should be construed by tabulating and computing expenses of all employees of the practice including the midwifes. Plaintiff has advanced *Page 26 
this particular interpretation some ten (10) years, more or less, after the contract period at issue in this matter has been concluded and some seven (7) years, more or less, after Plaintiff filed suit. (See Defendant's "Memorandum concerning CNM Payroll" objecting to the amendment.) Based upon the testimony of Walter Gendreau, John Ledoux, Plaintiff, and Defendant, this Court finds that Plaintiffs interpretation of expenses, as used in his Amended Complaint, was not within the intention of the parties at the time the contract was formed. Plaintiffs expectations, as set forth in his Amended Complaint, clearly do not emanate from the relative positions of the parties and the surrounding circumstances during the three year timeframe of the agreement (1995, 1996, and 1997). The court is not persuaded by any testimony on the record which would conclusively establish that proposition. See Dial Media, Inc. v. Schiff supra. Additionally, there are other clues, one of which appears in Plaintiffs Ex. 2, especially at paragraph 3 which provides that Defendant will be furnished with office technical and secretarial assistance but:
 . . .should the [Defendant] wish to hire a nurse practitioner to assist him with his patients, he shall do so at his own expense and shall assume sole responsibility for the salary, professional liability insurance and employee benefits of said nurse practitioner. The [Defendant's] hiring of a nurse practitioner shall not increase or otherwise affect the amount of Rent the [Defendant] is required to pay the [Plaintiff] hereunder. See Plaintiffs Ex. 2, paragraph 3 at p. 4 thereof.
Another clue lies in the testimony of Walter Gendreau wherein he admitted on cross examination that the figures he prepared excluded the lab because Defendant did not participate so it was "excluded on the income and expense side." (Walter Gendreau cross examination on May 13, 2008 morning session). *Page 27 
 Calculation of Expense Amounts
Both Walter Gendreau and John Ledoux testified at length about the data used to arrive at the expense figures set forth on Plaintiffs Ex. 43. John Ledoux also testified on May 29, 2008 during the afternoon session about a correction that needed to be made to the expenses on Plaintiffs Ex. 43. He testified that Mr. Gendreau had overstated the expense for gas. Plaintiffs Ex. 60 was introduced, explained, and admitted in full. It contained a corrected figure for the last quarter ending 12/31/97. The corrected total for the quarter ending 12/31/97 is $84,607. (Plaintiffs Ex. 60). The amount of $98,931 as set forth for that quarter on Plaintiffs Ex. 43 is incorrect. The Court accepts both the explanation and the corrected expense. The Court also accepts the total variable expenses, as set forth on Plaintiffs Ex. 43 with the correction made to the final quarter as stated above. Those expenses are found as facts set forth below:
 TABLE 1 — Total Variable Expenses
Total Variable Expenses:

Year ended 12/31/95:..... $337,127
Quarter ended 3/31/96:... $ 95,190
Quarter ended 6/30/96:... 86,367
Quarter ended 9/30/96:... 83,687
Quarter ended 12/31/96:... 85,020
Quarter ended 3/31/97:... 86,123
Quarter ended 6/30/97:... 94,012
Quarter ended 9/30/97:... 92,653
Quarter ended 12/31/97:... 84,607

Defendant's proportionate share, (discussed infra), needs to be computed from the above master list of expenses. Thereafter, to the Defendant's proportionate share amounts, the sum of $18,000 ($1,500 per month for 12 months per the rent provision in *Page 28 
Plaintiffs Ex. 2 at p. 1 and Defendant's Ex. A thereof) was added as rent for the first year ending 12/31/95 along with the sum of $3,772 for one-third of the equipment rental through 6/30/95. (See Plaintiffs Ex. 43 first column of figures for "Year ended 12/31/95). Thereafter for the succeeding quarters, the sum of $4,500 was added representing the sum of the rent and fixed expenses for each quarter. (Plaintiffs Ex. 43).
 Defendant's Revenues and Proportionate Share of TotalRevenues
It is necessary to determine Defendant's revenues and Defendant's proportionate share of the total practice revenues in order to address the necessary computations under the contract. Defendant's proportionate share of expenses is proportionate to his share of the revenues of the medical practice as calculated each month. (See Plaintiffs Ex. 1, p. 2, paragraph 1 and Plaintiffs Ex. 2, p.l, paragraph 1.1, and Plaintiffs Ex. 3, paragraph 2).
Plaintiffs Ex. 43 contains both Defendant's Revenues, total practice revenue, and Defendant's proportionate share. (See Plaintiffs Ex. 43, p2). The revenues of both Defendant and the practice are not seriously disputed as set forth on Plaintiffs Ex. 43 and in light of the total testimony at trial. The Court finds such amounts as follows:
TABLE 2 — Defendant's Revenues and Proportionate Share of Total Revenues

 Defendant's Revenues Total Practice Revenues Defendant's%
Year ended 12/31/95:..... $71,398 $1,076,819 6.63%
Quarter ended 3/31/96:... 30,704 299,384 10.26%
Quarter ended 6/30/96:... 36,190 325,988 11.10%
Quarter ended 9/30/96:... 45,554 342,935 13.28%
Quarter ended 12/31/96:.. 65,024 321,611 20.22%
Quarter ended 3/31/97:... 39,874 279,990 14.24%
Quarter ended 6/30/97:... 58,768 318,338 18.46%
Quarter ended 9/30/97:... 68,246 328,148 20.80%
Quarter ended 12/31/97:.. 118,670* 440,424 26.94%

* The final quarter includes preliminarycomputations for accounts receivable ($28,473), as well as deliveries owed to Defendant, ($45,709), as computed by Mr. Gendreau and John Ledoux. Some preliminary discussion of those amounts is in order at this time. *Page 29 
 Computations in the Final Quarter
In order to properly compute Defendant's revenues for the final quarter ending 12/31/97 under the agreement, it is necessary to determine the total accounts receivable as well as the deliveries owed. The basis for this proposition lies in the language of Plaintiffs Ex. 1. Said language, in pertinent part, provides: At the conclusion of this Agreement, the calculation of Income for the final quarter will include collectible accounts receivable accrued as of the termination date." (See Plaintiffs Ex. 1, p. 4, second full paragraph on said page).
 Accounts Receivable
Walter Gendreau testified for Plaintiff in detail about the process for computing collectible accounts receivable. He testified at length that the medical practice's "historical rating" for its accounts receivable was 58%. This meant that the practice collected 58% of its accounts receivable historically. Mr. Gendreau testified that the outstanding accounts receivable for Defendant amounted to $49,091. 58% of that amount would yield $28,473. This amount was used for calculations on Plaintiffs Ex. 43. This number is $11,815 less than other estimates for accounts receivable as listed on Defendant's Ex.'s P, and Z, and Plaintiffs Ex. 45 (Hospital's documents). The total amount of accounts receivable listed in those documents is $16,658. An analysis as to the implications of the $11,815 difference is necessary at this point. *Page 30 
Using Walter Gendreau's calculation of $28,473 as the correct amount of accounts receivable (using an historical 58% collection rate), Defendant earned a total of $118,670 for the final quarter ending 12/31/97. (including the amount used for deliveries owed). Against that amount of revenue, Defendant must compute his "proportionate share" of expenses. That amount is $27,293. See Table 3 and Table 4 below. Defendant's revenue exceeded his expenses by $91,377. This amount exceeds the quarterly income guarantee of fifty thousand dollars by $41,377. Given the fact that Defendant has exceeded the quarterly income guarantee, Plaintiff has no obligation to provide a 17.5% share of the income guarantee for said final quarter.
By comparison, even if the lesser amount of $16,658 were used as the correct amount of account's receivable, this would result in total revenue for Defendant in the amount of $106,855. Compared with the Total Practice Revenue (Table 2 above), Defendant's proportionate share of total expenses would amount to 24.26%. ($106,855/$440,424). Defendant's proportionate share of expenses would amount to $25,026. [84,607 X 24.26%] + 4,500 = 25,026. See Table 2, above, and Table 3 and Table 4 below. Comparing Defendant's Total Revenue using the smaller accounts receivable figure ($106,855) with a lower proportionate share of expenses ($25,026) still leaves excess income for the final quarter in the amount of $81,829 which still does not trigger Plaintiffs quarterly income guarantee obligation of 17.5% of the amount that the quarterly excess income falls short of the guarantee of $50,000.
Using the lower amount of accounts receivable for the Hospital's negotiations and settlement with Defendant, (of which Plaintiff was not a party), would work to lessen the excess income calculation for Defendant of which the Hospital agreed to pay 82.5% *Page 31 
share. Despite the Hospital's use of the lower number for the accounts receivable, the Court will use the amount computed by Walter Gendreau on Plaintiffs Ex. 43 who was cross-examined on this point during the trial. Mr. Gendreau's testimony was measured and confident on this particular issue and the Court accepts his testimony as to accounts receivable.
 Deliveries Owed
It is necessary to make a determination at this stage as to the amount owed by Plaintiff to Defendant for unpaid deliveries during the term of the agreement. Walter Gendreau testified that the figure is $45,709 (Plaintiffs Ex. 43 at p. 2). He testified that the calculations involved reveal a total obligation of $54,460 for the three years of the agreement. (Plaintiffs Ex. 46). This amount is agreed to by Defendant (Defendant's Proposed Findings of Fact #74). From that amount, the sum of $8,751 must be deducted as that amount was paid to Defendant. (Plaintiffs Ex. 46). (See specific check at Plaintiffs Ex.'s 8 and/or 46e) This is also agreed to by Defendant (Defendant's Proposed Findings of Fact #76). Subtracting the amount paid to Defendant from the total amount owed results in the figure of $45,709. This is the amount used on Plaintiffs Ex. 43 and the Court accepts that figure as a fact.
 Caveat Regarding Accounts Receivable and Deliveries Owed
It is important to keep the following caveat in mind regarding the computations for the final quarter of the agreement. Plaintiffs Ex. 1 requires the final quarter's calculations be made with accounts receivable. The calculated amount of $45,709 for deliveries owed by Plaintiff to Defendant is used as part of the account's receivable. Once the sum total of Defendant's revenue and total accounts receivable are used, a *Page 32 
calculation of Defendant's proportionate share of expenses for the final quarter can be computed by making like calculations including accounts receivable for the medical practice. Those calculations result in a figure of 26.94% as Defendant's proportionate share of the expenses for said final quarter. (See Table 2 above). One must keep in mind however, that Defendant has not received any of the calculated amounts of accounts receivable or deliveries owed simply because the amounts are used in the calculations and Tables set forth here. The amount used for deliveries owed needs to be considered and addressed during the Court's analysis of payments made between the parties pursuant to the agreement. (See Part III, infra. PAYMENTS ANALYSIS).
 Defendant's Proportionate Share of Expenses
It is next necessary to calculate Defendant's proportionate share of expenses in order to properly address the necessary calculations under the contract. The total variable expenses have already been found and set forth above. (Table 1). To properly arrive at Defendant's proportionate share of the variable expenses, it is necessary to use the same figure calculated as Defendant's proportionate share of the total revenues for a given period (calculated above in preceding section Table 2) and multiply that percentage against the total variable expenses for the first year and succeeding quarters. The calculations are set forth on Plaintiffs Ex. 43 (p.l) with the correction described in Plaintiffs Ex. 60. The Court finds as follows:
TABLE 3 — Defendant's Proportionate Share of Variable Expenses

 Total Variable Expenses: Defendant's % Defendant's Share of Variable
Year ended 12/31/95:....$337,127 6.63% $22,352
Quarter ended 3/31/96:..$ 95,190 10.26% 9,766
Quarter ended 6/30/96:.. 86,367 11.10% 9,587
Quarter ended 9/30/96:.. 83,687 13.28% 11,114
Quarter ended 12/31/96:. 85,020 20.22% 17,191
Quarter ended 3/31/97:.. 86,123 14.24% 12,264
Quarter ended 6/30/97:.. 94,012 18.46% 17,355
Quarter ended 9/30/97:.. 92,653 20.80% 19,272
Quarter ended 12/31/97:. 84,607 26.94% 22,793*

* Corrected amounts under Plaintiffs Ex. 60. *Page 33 
It is next necessary to add figures including rent and one-third of equipment rental for the first year and rent plus fixed expenses for the succeeding quarters. This will provide a calculation for Defendant's proportionate share of the total expenses. The calculations are set forth on Plaintiffs Ex. 43 (bottom line page 1) with the correction described in Plaintiffs Ex. 60. The Court finds as follows:
TABLE 4 — Defendant's Proportionate Share of TOTAL Expenses

 Def s Share One-third Rent Defendant's
 Variable Exp. Equip, rental TOTAL EXPENSE
 Through 6/95 OBLIGATION
Year ended 12/31/95: $22,352 $3,772 $18,000 $44,124
Quarter ended 3/31/96 9,766 4,500 14,266
Quarter ended 6/30/96 9,587 4,500 14,087
Quarter ended 9/30/96 11,114 4,500 15,614
Quarter ended 12/31/96 17,191 4,500 21,691
Quarter ended 3/31/97 12,264 4,500 16,764
Quarter ended 6/30/97 17,355 4,500 21,855
Quarter ended 9/30/97 19,272 4,500 23,772
Quarter ended 12/31/97 22,793* 4,500 27,293*

* Corrected amounts under Plaintiffs Ex. 60. *Page 34 
 Computations under the Contract
It is next necessary for the Court to construe the contract to factually determine the correct method for making computations provided within Plaintiffs Ex. 1. As a practical matter, Plaintiffs Ex. 1 provides for calculations to be made "within 30 days after the end of each quarter during the term of [the] Agreement." (Plaintiffs Ex. 1, p. 2, third paragraph). This was not done during the duration of the agreement.[29] The agreement specifically provides:
 your [Defendant's] accountant will supply the Hospital with a cumulative profit and loss statement and a comparison will be made between (1) patient revenues you have collected for professional services for the quarter (the "Income" as of the end of such quarter) and (2) reasonable practice expenses for such quarter, excluding your guaranteed compensation of $50,000 for such quarter (the "Quarterly Compensation Guarantee ") (the "Expenses" for such quarter). An independent calculation will also be made of cumulative Hospital advances (if any) made as of the end of such quarter less any repayments of Hospital advances made as of the end of such quarter (if any) (the difference being hereafter referred to as the "Outstanding Advances"). See Plaintiffs Ex. 1, pp. 2 and 3, parentheses in original. (emphasis added).
Once the comparison has been made, Plaintiffs Ex. 1 specifically provides:
 If the Income for such quarter does not exceed the Expenses for such quarter, the Hospital will advance the amount of shortfall to you, which amount will be added, together with the Hospital's proportionate share (as defined herein) of the amount of the Quarterly Compensation Guarantee, to the Outstanding Advances (if any). Plaintiffs Ex. 1, p. 3, paragraph 2).
The above specific contingency did not occur during the three years of the agreement. Comparing the figures set forth in Table 2 above (Defendant's Revenues) with the figures in Table 4 (Defendant's Proportionate Share of TOTAL Expenses) the Court finds it is *Page 35 
clear that Defendant earned more in the first year and each succeeding quarter than his proportionate share of expenses for the corresponding term. The next paragraph of Plaintiffs Ex.1 (p. 3, paragraph 3) is an important clause in the context of the facts of the instant case. The paragraph reads:
 If the Income for such quarter exceeds the Expenses for such quarter (the `quarterly excess income'), you will apply you will apply such quarterly excess income to the Quarterly Compensation Guarantee. If the quarterly excess income is less than $50,000, the Hospital will advance the Hospital's proportionate share of the amount of the shortfall to you [Defendant], which amount will be added to the Outstanding Advances (if any). If the quarterly excess income for such quarter is greater than $50,000, you will apply $50,000 to the Quarterly Income Guarantee, and you will repay to the Hospital any quarterly excess income that exceeds $50,000, such repayment not to exceed the amount of the Outstanding Advances as of the date of repayment. If the quarterly excess income is insufficient to discharge the Outstanding Advances, any outstanding advances that remain will be carried over to the succeeding quarter, (emphasis added).
The Court finds that at the end of the first year, and at the end of the next seven (7) succeeding quarters, the excess income was less than the income guarantee for the year or the respective quarter. The only quarter for which the excess income was greater than the income guarantee for that particular quarter was the final quarter ending 12/31/97.
The agreement (Plaintiffs Ex. 1) contains two other pertinent clauses on p. 4:
 At the conclusion of this Agreement, the calculation of Income for the final quarter will include collectible accounts receivable accrued as of the termination date. Any Outstanding Advances that remain after final reconciliation will be forgiven by the Hospital." (second full paragraph Plaintiff s Ex. 1 p. 4).
 The next paragraph on page 4 provides:
 The obligation to assure compensation under this agreement shall be allocated to Hospital and to [Plaintiff] in the proportions of 82.5% and 17.5% respectively, and neither party's obligations shall under any *Page 36 
circumstances extend to any greater percentage of the total obligation. [Plaintiff] will be directly responsible to you for his proportionate share of the compensation guarantee , (emphasis added).
Accordingly, Plaintiffs obligation under the contractual guarantee amounts to 17.5% of the amount that excess income fell short of the income guarantee for that period. The Court has computed the amounts in Table 5 below and finds that the amounts set forth in Table 5 are the findings of fact of the Court.
 TABLE 5
Findings Regarding Defendant's Total Revenue, Proportionate Share of Expenses, Comparison of Revenue to Expenses, and Plaintiffs Share of Income Guarantee

 Qtr/Year Revenue by Defendant's Excess Income Excess Dr.
 Ending Defendant Proportionate Income Guarantee Income vs Erinakes's
 Share of For Guarantee 17.5% share
 Total Perioda (short of
 Expenses guarantee)
 This Period
 12/31/95 $71,398 $44,124 $22,274 $200,000 ($177,726) $31,102.05
 Full year
 3/31/96 $30,704 $14,266 $16,438 $50,000 ($33,562) $ 5,873.35
 Quarter
 6/30/96 $36,190 $14,087 $22,103 $50,000 ($27,897) $ 4,881.97
 Quarter
 9/30/96 $45,554 $15,614 $29,940 $50,000 ($20,060) $ 3,510.50
 Quarter
 12/31/96 $65,024 $21,691 $43,333 $50,000 ($6,667) $ 1,166.73
 Quarter
 3/31/97 $38,874 $16,764 $22,110 $50,000 ($27,890) $ 4,880.75
 Quarter
 6/30/97 $58,768 $21,855 $36,913 $50,000 ($13,087) $ 2,290.23
 Quarter
 9/30/97 $68,246 $23,772 $44,474 $50,000 ($5,526) $ 967.05
 Quarter
 12/31/97 $118,670 $27,293 $91,377 $50,000 $41,377 N/A
 Quarter
 TOTALS $199,466 $54,673
 a The contract provides for a $600,000 guarantee over the relevant 3-year period. This amounts to $200,000 for each year of the 3-year period or $50,000 for each quarter. Excess income is measured against the $200,000 guarantee for the 1995 year and thereafter is measured against the $50,000 per quarter guarantee for the remaining periods. All amounts less than the guarantee for the relevant period are set forth in parentheses — ie. (177,726) means $177,726 short of the guarantee for that period. *Page 37 
 Further Findings Relative to Computations
Given the testimony, data, and exhibits in the case, if no money changed hands during the three-year term of the agreement, the Defendant would owe Plaintiff the sum of $199,466 for Defendant's proportionate share of expenses for that period. Likewise, if no money or other consideration changed hands, Plaintiff would owe Defendant $54,673 for Plaintiffs portion of the income guarantee under the contract. (Plaintiffs Ex.1). Additionally Plaintiff would owe Defendant for the unpaid deliveries as the amount set forth above for unpaid deliveries had not been received by Defendant. The implications of these findings will be discussed further in Part III, infra, PAYMENTS ANALYSIS.
The Court's findings as set forth in Table 5 and above comport with an important admission of Defendant in the record. Defendant admitted on cross-examination, "[H]e owed me on the guarantee and I owed him on the overhead and the rent."[30] Plaintiff has also consistently maintained throughout the proceeding that he was not guaranteeing or responsible for any of Defendant's expenses. Table 1, Table 3, and Table 4 above involve computations of the expenses of the medical practice excluding the midwifery service. The expenses are found as a fact by this Court and their respective values are set forth in the above tables as taken from Plaintiffs Ex. 43 as corrected by Plaintiffs Ex. 60. It is evident that under the formula applied as set forth in Table 5, Plaintiff isonly obligated to pay Plaintiffs share of the income guarantee. Plaintiffs share of the income guarantee is 17.5% of the amount that Defendant's excess income (the income exceeding expenses for the first year's end or relative quarter's end) was short of the guaranteed income for that first year or relative quarter. Plaintiffs share of those amounts has been *Page 38 
computed in Table 5 above for the first year and for the relative quarters. The Court finds as a fact that Plaintiff is not obligated to guarantee any of defendant's expenses.
It is also clear given the testimony before the Court that the Defendant had incurred expenses which were not a part of Plaintiff s medical practice and not included in the computations of overhead expenses as set forth thus far. Defendant testified that he purchased personal computers and other items for his practice. To the extent that the costs for said items are not included in the calculations depicted in Plaintiffs Ex. 43 as corrected by Plaintiffs Ex. 60, and to the extent that said other expenses of Defendant are not set forth in the tables above, the Court finds that Defendant is on his own for those expenses insofar as Plaintiff is concerned. While compensation for said items might be properly recoverable from the Hospital as "advances" under the terms of Exhibit 1, any remuneration for this specific category of expenses is between the Defendant and the Hospital and the Plaintiff is not obligated to pay any portion thereof.
Plaintiff has consistently maintained that he is entitled to the sum of $120,000 which he testified that the Hospital was required to pay him. This assertion is belied by the precise terms of Plaintiffs Ex. 1. Plaintiffs Ex. 1 specifically provides, "[F]rom January 1, 1995, through November 30, 1995, the sum of Rent and Variable Expenses is defined as a fixed sum of $10,000 monthly." (Plaintiffs Ex. 1, p.l under "Hospital Advances.") As the various contingencies for payouts are discussed, the Court finds that Plaintiffs Ex. 1 provides that payments will be madeto the Defendant and not to Plaintiff. See Plaintiffs Ex. 1, p. 3, second and third paragraphs on that page indicating the payments will be made "to you" meaning the addressee of the letter, the Defendant. The *Page 39 
Court finds that Plaintiff has no direct claim to the purported $120,000.[31] Defendant is on his own to pay both his own individual expenses as well as his proportionate share of the medical practice's expenses. The Court finds that the latter are payable directly to Plaintiff by the Defendant but not the Hospital.
 III PAYMENTS ANALYSIS
It is next necessary to determine what, if any, payments were made between and among the parties during the period of agreement relative to each party's obligation under the agreement. It is also necessary to consider what payments were made toward either party's obligations under the agreement once the agreement expired. This is the most difficult component of the Court's decision and the most vigorously contested area of the dispute.
Payments Made to Plaintiff by Defendant
Plaintiff alleges that Defendant has made payments totaling $109,128 over five years on the following schedule:

1995 $40,000
1996 0
1997 6,000
1998 31,128
1999 32,000 Total: $109,128 (See Plaintiffs Ex. 43 a)

Defendant alleges that he has made payments totaling $127,103 toward his expense obligations. (See Defendant's Proposed findings of Fact and Conclusions of Law #92.) (Citing Defendant's Ex. Q). Defendant also alleged in his initial answer that he had *Page 40 
already paid the Plaintiff the sum of "approximately one-hundred twenty thousand ($120,000) dollars."[32] Our Supreme Court has indicated that pleadings in a pending case which are still active claims are equally appropriate as evidence of inconsistency which may be used to impeach credibility. Bengston v Hines, 457 A.2d 247, 250 (R.I. 1983). The discrepancy in Defendant's two positions on the issue ($127,103 vs. $120,000) amounts to $7,103. The discrepancy between Plaintiffs position ($109,128) and Defendant's highest allegation on this issue ($127,103) is the sum of $17,975. A review of Defendant's Ex. Q indicates that it was admitted as a full exhibit for the limited purpose of three particular checks depicted thereon. (Testimony of Defendant on direct examination on July 17, 2008 afternoon session). Those checks were identified on Defendant's Ex. Q as:
 • Check # 1253 payable to "Tollgate" (name handwritten) in amount of $4,000 dated January 18, 1999 with handwritten memo indicating "overhead exp" (sic); the check is entirely handwritten.
 • Check # 1523 payable to "TOLLGATE OB/GYN (typewritten in capital letters) in amount of $3,500 dated October 26, 1999 with typewritten memo indicating "Rent" with handwritten addition to memo " overhead expenses." Except for the handwritten portion of the memo, the check is entirely typewritten.
 • Check # 1400 payable to "Tollgate OB GYN" in the amount of $5,000 dated July 16, 1999 with handwritten memo indicating "overhead expenses including rent."
Defendant provided expert testimony by John Reis suggesting that Defendant had paid the sum of $121,628 to Plaintiff towards overhead expenses. Ostensibly, Mr. Reis arrived at his figure by adding the three checks described above on Defendant's Ex. Q to the $109,128 amount that Plaintiff maintains was paid by Defendant. (See also Defendant's Proposed findings of Fact and Conclusions of Law #93 suggested as an alternate finding). While there is no evidence that Plaintiff ever refused to accept the *Page 41 
three checks on Defendant's Ex. Q as purportedly written with the notations to the effect they were meant for overhead expenses (see above descriptions and Defendant's Ex. Q), neither is there any conclusive and irrefutable evidence as to exactly when those notations were placed on the checks.
The Hospital (Plaintiffs Ex. 45 at p. 5) details Hospital Advances paid to Defendant. The Exhibit indicates "Direct Expenses Paid" in the amount of $108,931. The Court draws the inference that the Hospital was satisfied that Defendant had paid the sum of $108,931 to Plaintiff. The bottom right corner of the page has the typewritten notation 3/26/99 (ostensibly the date) on same.
Given the multiple options of proof available to the Court, the Court accepts Plaintiffs version that Defendant has made payments toward his obligations in the amount of $109,128. This amount is only $197 more than the "Direct Expenses Paid" in the amount of $108,931 discussed directly above. Furthermore, Plaintiffs proof and testimony from both Walter Gendreau and John Ledoux are more persuasive and credible to the Court than Defendant's proof on this particular issue.
 Deliveries Owed and "Double-Dipping"
The two-way agreement, Plaintiffs Ex. 2, clearly has a clause addressing payment for deliveries performed by the on-call physician. Clause 2.3 on p. 3 of Plaintiffs Ex. 2 specifically provides:
 2.3 The on-call physician will be reimbursed A) 50% of the delivery fee collected on all vaginal and cesarean deliveries performed for the other physician or by or for the Midwifery Service. B) 50% of the co-payment collected as part of the global fee for the deliveries performed. C) 50% of the surgeon's fee for the cesarean sections performed by the on call (sic) physician (as the assistant), and the other physician (as the surgeon) provided that the assistance fee will be part of the 50% of the surgeons (sic) fee collected by the on call *Page 42 
(sic) physician. With respect to all other procedures, including surgical procedures, performed for patients assigned to the other physician, the on-call physician will receive the full amount of the physician fee.
The Court has already found as a fact that Plaintiff is obligated to pay Defendant the sum of $45,709 as the balance due on deliveries owed. (See Table 2 above and Deliveries Owed discussed in Part II,supra). Plaintiffs Ex. 43 at p. 2 indicates as much as well as Plaintiffs Ex. 46. Plaintiff maintains that he gave Defendant free rent in exchange for Plaintiffs obligation to pay Defendant the sum of $45,709. Defendant vigorously denies such an arrangement and maintains that he received free rent from Plaintiff in return for providing coverage. The Court finds the Defendant's proof and testimony to be more persuasive on this issue. In so finding, the Court is aware that it has rejected Defendant's claim that three checks depicted on Defendant's Ex. Q should increase the sum total of the amount paid already by Defendant to the Plaintiff from $109,128 upwards by $12,500 (the sum of the three checks on Defendant's Ex. Q) to $121,628. Notwithstanding this fact, the Court rejects any contention that allowing Defendant to collect the full amount of deliveries owed ($45,709) is anomalous or inconsistent with the previous finding. Given the labyrinth of payments, collections, accounts, and figures in the instant matter, and given the Court's acceptance of Defendant's contention that he traded coverage for his rent; the Court is deciding the matter as a credibility issue after considerable review of both the exhibits and the notes of the testimony.
The next point in need of address is the Plaintiffs consistent contention that Defendant should not be allowed to "double-dip" in his recovery for amounts owed on deliveries. A "double-dip" is an expression referring to the act or practice of receiving *Page 43 
more than one income or collecting double benefits from the same employer or organization. See Random House Dictionary, © 2009 accessed via www.dictionary.com on March 21, 2009. Setting forth his argument, Plaintiff correctly maintains that Defendant should not be allowed to collect for deliveries owed from the Hospital and Plaintiff via the income guarantee in Plaintiffs Ex. 1 (whereby Plaintiff would pay 17.5% of the amount owed while the Hospital paid 82.5% of the amount owed) while Plaintiff must also pay the amount for the deliveries owed ($45,709) directly to the Defendant after there has been a full accounting between Defendant and Hospital at the end of the three year term.
The problem with Plaintiffs argument is that Plaintiff never had to pay 17.5% of the unpaid deliveries amount as part of Plaintiffs obligation under the income guarantee. Using the deliveries owed figure ($45,709) in the final quarter (See Plaintiffs Ex. 43 p. 2) results in no income guarantee being triggered in the final quarter. (See Table 5 above.) Defendant is still entitled to collect the amount of deliveries he is owed and the Court has found that to be $45,709.
Notwithstanding, Defendant is still obligated to pay the Plaintiff the amount of deliveries owed to Plaintiff. The Court finds that amount to be the sum of $2,295.52. (Plaintiffs Ex. 46).
 Other Obligations, Agreements, and "Offsets"
Notwithstanding Clause 11 of the two-way agreement (Plaintiffs Ex. 2 at p. 5), specifically providing: "77. This Agreement may be amendedonly by a writing signed by each of the parties.'" (emphasis added), the parties have introduced evidence of and testimony regarding matters not specifically covered in the three-way agreement *Page 44 
(Plaintiffs Ex.1), the two-way agreement (Plaintiffs Ex. 2) or the amendment to the two-way agreement (Plaintiffs Ex. 3). Such matters include the Redux weight loss program alleged by Plaintiff as well as the obligations generated by the lab fees.
It is clear that no writing exists with regard to such issues amending any of the relevant agreements to cover those particular arrangements. Neither the Redux nor the lab payments matters appear to be specifically mentioned in the pleadings of either party, discussed above, except for the possible omnibus inclusion under the affirmative defense of "offset" as set forth by both parties in their respective answers. They do not appear to be "obligations" as may be found within the four corners of the contract including Plaintiffs Ex.'s 1, 2, and 3. While the Court might properly disregard these particular matters, some of the Court's credibility findings are tied to the equities set forth by each side given the scope, age, and duration of the dispute as well as each party's relative control of the situation. The Court will treat these matters as "offsets"[33] and endeavor to decide the matters at this time.
The Court finds that the parties had an agreement to market Redux during the three years of their agreement and the Court finds that Plaintiff owes Defendant the sum of $6,241 for the Redux arrangement. (Plaintiffs Ex. 46).
The Court also finds there was an agreement allowing Defendant to use Plaintiffs lab during the period of their agreement. The Court received a great deal of testimony regarding CLIA procedures. (See footnotes 5 and 6, supra as well as testimony of Sandra Plante, Nancy Hines, Laura Burwell (Braga), Donna Falso, and Cecelia Louise Seippel). The Court accepts Defendant's testimony that he has not received an individual certification to perform tests that require a CLIA certification. The Court *Page 45 
also accepts that Plaintiffs lab is a CLIA certified lab. The issue remaining involves whether Defendant could properly receive payment for tests for which he was not personally certified but for which the lab was definitely certified. The Court heard testimony from Sandra Plante, Donna Falso, and Nancy Hines, all of whom possessed a degree of familiarity with clinical laboratory requirements and procedures. None of the witnesses could definitively state whether a properly licensed clinical laboratory could legitimately bill for and receive payments for tests ordered by a physician who did not have an individual CLIA certification. The Court did hear testimony from Cecelia Louise Seippel on the issue of payments for lab tests. She testified that payments were sent by check from various insurance companies and the checks were placed in the individual physician's account. (May 28, 2008 morning session). Defendant specifically denies this. The Court finds Ms. Seippel's testimony more persuasive on this particular issue and given her candor and forthrightness, the Court is not inclined to believe that she fabricated the answer. It is important to note that the Court makes no finding as to the propriety vel non of the receipt of any such payment in the specific context of this case. The Court finds that given the information in evidence before the Court, Defendant owes Plaintiff the sum of $6,077 for lab work for the years 1995-1996 and the Defendant owes Plaintiff the sum of $21,513 for the lab work in the years of 1997-1998. Again, the credibility findings are tied in to resolving the equities of the entire case given what was presented before, during, and after trial. *Page 46 
 IV. SUMMARY FINDINGS
Given the Court's findings as set forth above, it is appropriate at this juncture to set forth the specific findings in succinct fashion to allow one to view the findings as a whole.

• Defendant's proportionate share of expenses
for three-year period (Defendant owes this amount to
Plaintiff) $199,466.00
• Plaintiffs 17.5% share of income guarantee for
three-year period (Plaintiff owes this amount to
Defendant) (subtract) — $ 54,673.00
• Differential in above two figures: (this does not consider
any payments made by Defendant over the years $144,793.00
• If Defendant had not made any payments at all, he would
owe Plaintiff the above amount for expenses
• Total Payments made by Defendant to Plaintiff for
Defendant's proportionate share of expenses
for three-year period (subtract) — $109,128.00
• Balance remaining that Defendant owes to Plaintiff for
Defendant's proportionate share of expenses
for three-year period $ 35,665.00
• Add amount Defendant owes to Plaintiff for unpaid
deliveries owed to Plaintiff (add) + $ 2,295.52
• Add amount Defendant owes to Plaintiff for unpaid
lab fees for 1995-1996 (add) + $ 6,077.00
• Add amount Defendant owes to Plaintiff for unpaid
lab fees for 1997-1998 (add) + $21,513.00
• Total amount Defendant owes Plaintiff for unpaid
deliveries and lab fees for 95-96 and 96-97 (total) = $ 65,550.52
• The $65,550.52 figure represents Defendant's obligation
to Plaintiff after considering outstanding lab fees and
deliveries owed to Plaintiff (Plaintiff s offsets);
Defendant's entitlement to unpaid deliveries and other
offsets needs to be considered and factored into the final
computation at this time
• Subtract amount Plaintiff owes to Defendant for unpaid
deliveries (subtract) — $ 45,709.00
• Also subtract amount Plaintiff owes to Defendant for
unpaid Redux arrangement pursuant to the testimony
and exhibits (Defendant's offsets) (subtract) — $ 6,241.00
• Balance remaining that Defendant owes to Plaintiff $ 13,600.52
 *Page 47 
 V. CONCLUSION
Judgment shall enter for the Plaintiff against Defendant in the amount of $13,600.52. Counsel shall submit an appropriate judgment.
[1] Several of the trial days were not full days due to other duties of the Court.
[2] Some of the witnesses testified more than once during the Plaintiff's phase, Defendant's phase, and the rebuttal phase of the trial resulting in nineteen total witness presentations.
[3] The Court received 85 full exhibits from Plaintiff and 16 full exhibits from Defendant.
[4] The word "lab" refers to the Clinical laboratory used in conjunction with a medical practice to perform various tests on a patient's specimens as a part of the patient's diagnosis and treatment.
[5] See footnote 6, infra and also refer to rebuttal testimony of Nancy Hines.
[6] CLIA is an acronym for Clinical Laboratory Improvements Amendments, 42 CFR Part 493 (See Plaintiff's Ex. 65) and also Plaintiff's Ex. 66, "Rules and Regulations for Licensing Clinical Laboratories and Stations" promulgated by Rhode Island Department of Health. One of the issues in the case involves Defendant's claim that he was unable to perform tests where a CLIA certification was needed. Plaintiff claims the lab was CLIA certified and licensed and performed all tests ordered by Defendant including both CLIA waived and those where a CLIA certification was needed and billed for all tests in the name of Defendant. That issue will be discussed infra.
[7] "Coverage", as used specially herein, refers to the situation where a physician is unable, due to vacation or other commitment, to be present at the hospital when that physician's patient is ready to give birth. Under a "coverage" arrangement, another physician "covers" for the absent physician. The details regarding what the covering physician is paid to attend the absent physician's patient is worked out among the doctors.
[8] Complaint, Count I Paragraph 3.
[9] Complaint, Count I, Paragraph 4.
[10] See Footnote 7, supra.
[11] Complaint, Count I, Paragraph 5.
[12] Complaint, Count II.
[13] Answer, Paragraph 4.
[14] Defendant's Answer, Paragraph 6, p. 2 thereof.
[15] Answer, Paragraph 6.
[16] All set forth in Third Affirmative Defense
[17] Fifth Affirmative Defense
[18] Defendant's Counterclaim, Count II, Paragraph 9.
[19] Defendant's Counterclaim, Count II, Paragraph 10.
[20] Defendant's Counterclaim, Count II, Paragraph 10
[21] Plaintiff's Amended Complaint Paragraph 8.
[22] Plaintiff's Amended Complaint Paragraph 9.
[23] This would be the "Ledoux Memorandum" discussed infra and set forth in Plaintiff's Ex. `s 4 and 4a.
[24] Plaintiff's Amended Complaint, Count II, Paragraph 11.
[25] Plaintiff's Amended Complaint, Affirmative Defenses 2 and 3.
[26] Under the Rules of Professional Responsibility an attorney must "act with zeal in advocacy upon the client's behalf." Rule 1.3, commentary 1 of Article Vof the Rules of Professional Conduct. That obligation was fulfilled on this issue.
[27] Plaintiff's Amended Complaint Paragraph 7
[28] See Footnote 7, supra.
[29] Defendant testified that he was not allowed to access the books and accounts of the medical practice and was told to deal with Plaintiff's accountants. Plaintiff denied Defendant's assertion on this point during his own testimony. Given the totality of the Court's observations throughout the trial, the Court accepts Defendant's testimony on this point. The Court's calculations are performed in Table 5 infra.
[30] Defendant on cross-examination on 7/21/08 afternoon session.
[31] Actually, by the precise terms of the agreement, the expense provision for the first year in 1995 runs from January through November for a period of eleven months totaling $110,000. The Court is unsure from the record including the pleadings, testimony, and arguments whether this is a mere typographical error, or whether it is intentional.
[32] Defendant's Answer, Paragraph 6. p. 2 thereof; See Footnote 14supra
[33] See Each Party's Affirmative Defenses footnotes 16, 17, and 25,supra.